UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTONIA DeTOLEDO and <br> LIANA WILLIAMS, <br>     Plaintiffs <br><br> v. <br><br> COUNTY OF SUFFOLK, <br> Lt. ANGELO RAO, Sgt. JANET <br> SINCLAIR, Dpty. SYLVIA THOMAS, <br>     Defendants. | C.A. No. 03-CV-10834-RGS |

## PLAINITFFS, ANTONIA DeTOLEDO AND LIANA WILLIAMS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Plaintiffs, Antonia DeToledo ("DeToledo") and Liana Williams ("Williams") respectfully submit this Opposition to the Defendants' Motion for Summary Judgment.

### I. INTRODUCTION

This is a civil action by which the plaintiffs seek to recover damages for physical and emotional injuries predicated on claims that the defendants, Lieutenant Angelo Rao, Sergeant Janet Sinclair, and Deputy Sylvia Thomas violated the plaintiffs' constitutional right to be free from deprivation of liberty without due process of law and from excessive and/or unreasonable force, resulting from an unlawful arrest, detention, and in Williams' case, a strip search that occurred on July 26, 1998 while the plaintiffs were lawful visitors to the South Bay House of Corrections.  See Exhibit 1, Plaintiffs' Second Amended Complaint.  In their complaint, filed in Suffolk Superior Court on or about June 13, 2001, and subsequently removed to the United States District Court, District of Massachusetts, the plaintiffs alleged that the defendants violated their civil rights by wrongfully taking

1

the plaintiffs into custody, handcuffing the plaintiffs, removing the plaintiffs from the waiting area to the booking station within the facility, placing Williams in a holding cell for an extended period of time, and strip searching Williams. See Exhibit 1.

## II. FACTUAL BACKGROUND

On July 26, 1998, the plaintiffs, Antonia DeToledo and Liana Williams, were visitors at the South Bay House of Corrections in Boston, Massachusetts. The two women were unknown to each other, and had come to the South Bay House of Correction to visit different individuals. DeToledo, a Portuguese speaking woman, entered the ladies' room, and upon exiting the bathroom was confronted by several corrections officers. See Exhibit 2, DeToledo Deposition, p. 30. (Hereinafter Exhibit 2, p. __). DeToledo was extremely shaken when suddenly confronted by so many uniformed officers without any apparent reason. Exhibit 2, p. 30. DeToledo was grabbed and handcuffed by a uniformed officer and taken away. Exhibit 2, p. 30, 34. Lieutenant Angelo Rao ("Rao") testified that he was concerned that the individual they had taken into custody was not Liana Williams, as thought, but he ordered that she be handcuffed and escorted into the facility nevertheless. See Exhibit 3, Rao Deposition, p. 42. (Hereinafter Exhibit 3, p. __). DeToledo was escorted in handcuffs to the booking station, but before reaching the booking station, Rao received a telephone call from Officer Rowland stating that the woman in handcuffs was not Liana Williams. Exhibit 3, p. 46.

Before the handcuffs were removed from DeToledo, she began to have difficulty breathing and a "man down" was called in the facility. Exhibit 3, p. 47. Medical personnel were called to the scene to render medical treatment to DeToledo. Exhibit 3, p.

48. An ambulance was called to the facility to transport her to a nearby hospital for medical treatment. See Exhibit 4, Sinclair Deposition, p. 94 (Hereinafter Exhibit 4, p. __).

Under circumstances similar to those of Antonia DeToledo, at the time of her unlawful arrest and detention, Liana Williams had visited the South Bay House of Corrections on July 26, 1998 with the intent on visiting her fiancé, Michael Ethridge. While standing in the first floor lobby with her six-month-old baby and stepson, Williams was approached by several uniformed corrections officers. See Exhibit 5, Williams Deposition, p. 29 (Hereinafter Exhibit 5, p. __). Rao approached Williams and stated that she had an outstanding warrant and was going to be arrested. Williams repeatedly stated to Rao that she did not have an outstanding warrant and that she had paperwork in her locker that confirmed that she did not have a warrant. Exhibit 5, p. 24. Rao stated to Williams that no paper could override the document he had in his hand. Exhibit 5, p. 25.

Williams was handcuffed and taken through the sallyport into the facility. Once inside, she was taken to a "shake down" room and strip searched. See Exhibit 6, Thomas Deposition p.119 (Hereinafter Exhibit 6, p. 119). Before and during the strip search, she repeatedly told the correction officer, Thomas or Sinclair, that she did not have a warrant and that she had a paper in her locker that confirmed that she did not have a warrant. Exhibit 5, p. 29. During the strip search, Williams was forced to remove all of her clothing, bend over and separate her buttocks, and open her mouth for a visual inspection.

After the strip search, Williams was told to put her clothes back on and she was moved to holding cell no. 9 where she was held for several hours before her transport to Nashua Street jail. Exhibit 5, pp. 29-30; 52. At approximately 10:00 p.m., Williams was

3

shackled and transported to Nashua Street jail. Exhibit 5, p. 32. Upon arrival to Nashua Street jail, an officer met them, looked at the paperwork and told the correction officers that the warrant was recalled. Williams was returned to the South Bay House of Correction at approximately 11:00 p.m. See Exhibit 7, Liana Williams Answer No. 19 to Defendants' Interrogatories. Upon her return, Williams' clothes were returned to her, and she contacted a friend to pick her up and drive her home. Exhibit 5, p. 36.

As a result of the incident, Williams suffered injuries to her ankles, from the shackles, and psychological trauma associated with the entire incident. Exhibit 5, p. 20; 37.

### III. STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Fed.R.Civ.P. 56(c), attached hereto as Exhibit 8.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record showing the absence of a genuine dispute of material fact." See Bates v. Mackay, et al., 321 F.Supp.2d 173, 178 (D. Mass. 2004) *quoting* Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The non-moving party must demonstrate that "every essential element of its claim or defense is at least trialworthy." See Bates, 321 F.Supp.2d at 178 *quoting* Price v. General Motors Corp., 931 F2d 162, 164 (1st Cir. 1991).

In the present case, a genuine dispute exists regarding whether the defendants' actions were negligent or rose to the level of recklessness and demonstrated a callous

4

indifference to the constitutional rights of DeToledo and Williams. The record is replete with genuine issues of material facts that could only be decided by a jury after hearing the evidence. Whereas the defendant has failed to meet its burden, the defendants' Motion for Summary Judgment must be denied.

## IV. ARGUMENT

I. **THE COURT MUST DENY THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BECAUSE THE DEFENDANTS VIOLATED THE PLAINTIFFS', ANTONIA DETOLEDO AND LIANA WILLIAMS, RIGHT TO BE FREE FROM DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS OF LAW.**

This court should deny the Motion for Summary Judgment because factual evidence in this case clearly demonstrates that the defendants violated the plaintiffs' constitutional right to be free from deprivation of liberty without due process of law. Government officials may be held liable for a deprivation of life, liberty, or property without due process if their conduct reflects a reckless or callous indifference to an individual's rights. Germany v. Vance, 868 F.2d 9, 21 (1st Cir. 1989). An official displays such recklessness or callous indifference "when it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." Id. The defendants' conduct was in fact reckless and displayed callous indifference to the rights of DeToledo and Williams because the basis of the arrests and detentions was a document which clearly and unambiguously had the words "Recalled Warrant" repeatedly marked across its face. See Exhibit 9, Recalled Warrant.

### A. The Arrest and Detention of Antonia DeToledo was a Violation of her Constitutional Rights.

The unauthorized arrest and detention of Antonia DeToledo by the defendants was a clear violation of her right to be free from deprivation of liberty without due

5

process of law. The defendants were reckless and showed callous indifference to DeToledo's rights when they arrested her based upon a facially invalid warrant and based only upon a comparison to a driver's license photograph of Liana Williams, a woman seventeen years her junior who bore no reasonable resemblance to DeToledo. Exhibit 3, p. 32; See Exhibit 10, Driver's License Photographs of Antonia DeToledo and Liana Williams.

The standard to which government officials are held regarding violations of a person's constitutional rights was set forth in Germany v. Vance, 868 F.2d 9 (1st Cir. Mass. 1989). In Germany, the court held that government officials may be held liable for conduct that reflects a reckless or callous indifference to an individual's rights. Germany v. Vance, 868 F.2d at 18. In a case involving the very same issues to that in the present case, the court applied this standard in Torres Ramirez v. Bermudez Garcia, 898 F.2d 224 (1st Cir. Mass 1990). In Torres Ramirez, one of the defendants, a General Marshall of the Guayama Court in Puerto Rico, requested execution of a previously recalled warrant. The court held that a jury could have found that this defendant was reckless, either by knowingly possessing an invalid warrant or for failing to check his own records, which would have confirmed that the warrant was in fact recalled. See Torres Ramirez at 227.

In Pena-Borrero v. Estremeda, 365 F.3d 7 (2004) the 1st Circuit Court of Appeals found that a police officer who arrested an individual *despite being shown evidence that invalidated the warrant* was deemed reckless. See Pena-Borrero, 365 F.3d 7, 13. The court concluded that following through with the arrest and detention of the plaintiff, once confronted with a document that invalidated the warrant, reflected a deliberate disregard for whether the warrant remained valid. See Pena-Borrero, 365 F.3d 7, 13. The

defendants in the instant case, similar to the defendants in Pena-Borrero, displayed the very same reckless conduct.

The defendants' conduct in the instant case relative to DeToledo's arrest and detention was reckless and displayed a callous indifference to DeToledo's constitutional rights because the warrant had the words "Recalled Warrant" clearly imprinted several times on the face of the document. Exhibit 9. Rao claimed that he did not see the words "Recalled Warrant" on the face of the warrant until he retrieved his glasses from his locker later in the evening. Exhibit 3, p. 64. Taking Rao's statements as true, though they are disputed by his own sworn testimony that he was able to see and compare Williams' social security number on the warrant with the social security number printed on her driver's license, his actions demonstrate a callous indifference to DeToledo's constitutional rights. Exhibit 3, p. 33. Rao admitted that he effectuated an arrest warrant even though he was unable to read the warrant, and he took no steps to read the entire warrant before arresting and detaining DeToledo. Rao even claimed that he saw several black lines across the face of the warrant, which he later found out revealed the words "Recalled Warrant." Exhibit 3, pp. 64-65. Rao could have easily retrieved his glasses from his locker, or had another correction officer read the warrant to him. The very fact that Rao took absolutely no steps to ensure he could read the warrant demonstrates, at a minimum, callous indifference to DeToledo's constitutional rights.

In addition to Rao's conduct with respect to the warrant, Rao also demonstrated reckless conduct with respect to the identification of Antonia DeToledo as Liana Williams. The arrest and detention of DeToledo was based upon the defendants, Rao, Sinclair and Thomas, comparing a driver's license photograph of Liana Williams to

7

Antonia DeToledo. The defendant, Rao, testified that he was concerned that the DeToledo was not Williams, but took absolutely no steps to resolve his concerns prior to arresting and detaining DeToledo. Exhibit 3, p. 42. Despite the absence of any evidence that DeToledo was Williams, Rao arrested her, had her handcuffed, detained, and moved inside the corrections facility. Based upon the testimony of the defendants, with respect to the arrest and detention of DeToledo, it is difficult to view such conduct on the part of the defendants as anything less than reckless, and involving callous indifference to DeToledo's constitutional rights.

### B. The Arrest, Detention, and Strip Search of Liana Williams was a Violation of her Constitutional Rights.

The unauthorized arrest, detention, and strip search of Liana Williams by the defendants was a violation of Liana Williams' right to be free from deprivation of liberty without due process of law. The defendants were reckless and showed callous indifference to Williams' constitutional rights when they arrested, detained and strip searched her based upon an invalid warrant clearly marked as such on its face.

As set forth in the preceding argument, the standard to which government officials are held regarding violations of a person's constitutional rights was set forth in Germany v. Vance, 868 F.2d 9 (1st Cir. Mass. 1989) and applied in Torres Ramirez v. Bermudez Garcia, 898 F.2d 224 (1st Cir. Mass 1990) and Pena-Borrero v. Estremeda, 365 F.3d 7 (2004). In Germany, the court held that government officials may be held liable for conduct that reflects a reckless or callous indifference to an individual's rights. Germany v. Vance, 868 F.2d at 18.

This standard was applied in Torres Ramirez v. Bermudez Garcia, 898 F.2d 224 (1st Cir. Mass 1990). In Torres Ramirez, one of the defendants, a General Marshall of the

8

Guayama Court in Puerto Rico, requested execution of a previously recalled warrant. The court held that a jury could have found that this defendant was reckless, either by knowingly possessing an invalid warrant or for failing to check his own records, which would have confirmed that the warrant was recalled. See Torres Ramirez at 227.

Also, the 1st Circuit Court of Appeals in Pena-Borrero v. Estremeda, 365 F.3d 7 (2004) found that a police officer who arrested an individual despite being shown evidence that invalidated the warrant was reckless. See Pena-Borrero, 365 F.3d 7, 13. The court concluded that following through with the arrest and detention, once confronted with documents that invalidated the warrant, reflected a much more deliberate disregard for the warrant's actual validity. See Pena-Borrero, 365 F.3d 7, 13. The defendants in the instant case, similar to those in Pena-Borrero, displayed similar reckless conduct.

The defendants' conduct in the instant case relative to Williams' arrest, detention, and strip search, was reckless and displayed a callous indifference to Williams' constitutional rights because the warrant had the words "Recalled Warrant" typed several times across its face. Exhibit 9. Rao claimed that he did not see the words "Recalled Warrant" on the face of the warrant until he retrieved his glasses from his locker later in the evening. Exhibit 3, p. 64. Taking Rao's statements as true, though they are disputed by his own sworn testimony that he was able to see and compare Williams' social security number on the warrant with the social security number printed on her driver's license, his actions demonstrate a callous indifference to Williams' constitutional rights. Exhibit 3, p. 33. Rao admitted that he effectuated an arrest warrant even though he was unable to read the warrant, and he took no steps to read the entire warrant before

Williams was arrested, detained, and strip searched. Rao even claimed that he saw several black lines across the face of the warrant, which he later found out revealed the words "Recalled Warrant." Exhibit 3, pp. 64-65. Rao could have easily retrieved his glasses from his locker, or had another correction officer read the warrant to him. The very fact that Rao took absolutely no steps to ensure he could read the warrant demonstrates, *at a minimum*, callous indifference to Williams' constitutional rights.

Also, Williams protested several times before her arrest and during her detention regarding the validity of the warrant. The court in Soto v. Bzdel, 214 F.Supp. 2d 69 (D. Mass 2002) held that an arresting officer bears some responsibility to confirm information that could invalidate a warrant. See Soto v. Bzdel, 214 F.Supp. 2d at 70. In Soto, the plaintiff was stopped by the defendant, a state trooper; when a routine warrant check revealed an outstanding warrant. The plaintiff was placed under arrest even though he had a Notice of Recall on his person and stated this fact to the arresting officer. Id. The court held that the defendant was reckless when he decided to proceed with the arrest despite having information readily accessible that would invalidate the warrant. Id.

In the present case, Williams repeatedly told Rao that she had paperwork in her locker that confirmed that she did not have a warrant. Exhibit 5, p. 24. Despite having potentially exculpatory documents within a few feet of Rao and the other correction officers, Rao, Thomas, and Sinclair never checked the document to confirm or deny the information Williams was telling them. The defendants, like the defendants in Soto, had information readily accessible that would have confirmed that the warrant was recalled. See Soto v. Bzdel, 214 F.Supp. 2d 69 (D. Mass 2002). By the defendants failing to check

the information Williams had in her locker, their conduct was reckless and showed a callous indifference to Williams' constitutional rights.

In addition, the strip search of Williams by Thomas or Sinclair amounted to a callous indifference for the constitutional rights of Williams. The ambiguity with respect to which correction officer performed the strip search stems from Thomas' denial that she performed the strip despite a statement to Stephen Jacobs, an investigator into this incident, shortly after the incident stating that she did perform the strip search. See Exhibit 11, Supplemental Report of Stephen F. Jacobs, dated 8/07/98 (Hereinafter Exhibit 11). At her deposition, however, she denied performing the strip search and claimed that Sinclair performed the strip search of Williams. Exhibit 6, p. 119.

Thomas or Sinclair, in performing the strip search of Williams demonstrated a callous indifference to Williams' constitutional rights. Williams continued to make repeated protests to Thomas that the warrant was not valid, but Thomas refused to check the information. Exhibit 5, p. 29. Again, similar to the defendants in Soto, who refused to check a notice of recall on an individual's person, the defendants failed to check the paperwork Williams had in her locker that would have confirmed that the warrant had been recalled. See Soto v. Bzdel, 214 F.Supp. 2d 69 (D. Mass 2002). In addition, Thomas and Sinclair never read the warrant despite the protests from Williams that the warrant had been recalled. There has been no evidence presented that Sinclair and Thomas were prohibited from retrieving the documents Williams had in her locker or from reading the warrant.

Instead of personally reading the warrant, checking the documents Williams had in her locker, or placing a phone call to someone to confirm the information contained in

the warrant, Thomas or Sinclair strip searched Williams. The Suffolk County Sheriff's Department Policy, in effect on the date of this incident, July 26, 1998, states that strip searches shall be performed on "inmates committed to the facility." See Exhibit 12, SCSD Policy S-507. Thomas testified in her deposition that individuals taken into custody, similar to Williams on July 26, 1998, were considered detainees and not inmates. Exhibit 6, pp. 55-56. Although Thomas testified that it was "policy" to strip search any individual detained by the Suffolk County Sheriff's Department in their facility, no such policy exists confirming this fact.

## II. THE DEFENDANTS VIOLATED THE PLAINTIFFS, ANTONIA DETOLEDO AND LIANA WILLIAMS' RIGHT TO BE FREE FROM EXCESSIVE AND/OR UNREASONABLE FORCE BECAUSE THE PLAINTIFFS SHOULD NEVER HAVE BEEN ARRESTED AND HANDCUFFED.

The defendants violated the Plaintiffs' right to be free from *excessive* or *unreasonable* force because the defendants should not have arrested, handcuffed, and detained the plaintiffs under the attendant circumstances. The Fourth Amendment clearly states that all individuals have the right to be free from excessive and unreasonable force. In order for government officials to use force to arrest an individual, they must act under some color of law. In the present case, there was no legal or otherwise apparent basis to arrest either DeToledo or Williams, therefore, *any* force used would be excessive and/or unreasonable. See Schiller v. Strangis, 540 F. Supp 605 (D. Mass. 1982). In Schiller v. Strangis, the defendants arrested the plaintiff without a warrant or probable cause. 540 F. Supp 605, 609 (D. Mass. 1982). The plaintiff was subsequently handcuffed, searched, and struck with a flashlight. Id. The court held that the defendants were liable for excessive force, reasoning that the use of *any* force was excessive since the arrest itself

was unlawful. Id. at 619. The court found that "the constitutional line has been crossed" because the use of force occurred during other constitutional violations, including an unlawful arrest. Id.

In the present case, since the arrest of both DeToledo and Williams was unlawful, the use of handcuffs to restrain the plaintiffs, and the strip search of Williams, was excessive and/or unreasonable given the circumstances.

### A. The Detention of Antonia DeToledo Violated her Constitutional Right to be Free from Excessive and/or Unreasonable Force.

The arrest and detention of DeToledo was unlawful; therefore *any* force used upon her was excessive. Like the defendants in Schiller, the defendants made an unlawful arrest of DeToledo and handcuffed her, and therefore any use of force was excessive and unreasonable. See Schiller v. Strangis, 540 F. Supp 605 (D. Mass. 1982). This conduct violated her constitutional right to be free from excessive and/or unreasonable force. The arrest of DeToledo was unlawful because it was based on a facially invalid warrant and no other probable cause for her arrest existed. A reasonable officer in the defendants' position would have believed that such conduct was unlawful in light of the clear, unambiguous and repeated notice alerting the defendants of the recall.

### B. The Arrest of Liana Williams Violated her Constitutional Right to be Free from Excessive and/or Unreasonable Force.

Similar to the argument stated above, any amount of force used pursuant to an unlawful arrest is excessive. See Schiller v. Strangis, 540 F. Supp 605 (D. Mass. 1982). In Schiller v. Strangis, the defendants arrested the plaintiff without a warrant or probable cause. 540 F. Supp 605, 609 (D. Mass. 1982). The plaintiff was subsequently handcuffed, searched, and struck with a flashlight. Id. The court held that the defendants were liable for excessive force, reasoning that the use of any force was excessive since

13

the arrest itself was unlawful. Id. at 619. The court found that "the constitutional line has been crossed" because the use of force occurred during other constitutional violations, including an unlawful arrest. Id.

The arrest of Williams was indisputably unlawful; therefore *any* force used upon her was excessive. Like the defendants in Schiller, the arresting officers made an unlawful arrest of Williams, handcuffed her, and subjected her to a strip search. This conduct violated her constitutional right to be free from excessive and/or unreasonable force. The arrest of Williams was unlawful because it was based on a facially invalid warrant and no other probable cause for her arrest existed. A reasonable officer in the defendants' position would have believed that such conduct was unlawful in light of the clear, unambiguous and repeated notice alerting the defendants of the recall. Schiller at 605.

### III. THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE A REASONABLE OFFICER IN THEIR POSITION WOULD HAVE VIEWED THE ARREST AND DETENTION OF DETOLEDO AND WILLIAMS AND THE STRIP SEARCH OF WILLIAMS AS UNLAWFUL.

The defendants are not entitled to qualified immunity because their conduct -- in light of the facts and circumstances surrounding the arrest and detention of DeToledo and Williams -- was patently unreasonable, and a reasonable officer under similar circumstances would have viewed such conduct as unlawful. In Saucier v. Katz, 533 U.S. 194, 203 (2001) the Supreme Court, enunciated a two-part inquiry for claims of qualified immunity. See Saucier v. Katz, 533 U.S. at 203. First, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. Second, "if a violation could be made out on a

favorable view of the parties' submissions, "the court must then determine" whether the right was clearly established "at the time of the incident." Id.

The arrest and detention of DeToledo and Williams and the strip search of Williams was based solely upon the execution of a facially invalid warrant. The defendants recklessly deprived the plaintiffs of their constitutional right to liberty and unreasonably subjected both plaintiffs to excessive and unreasonable force. These rights were clearly violated at the time of the arrest and a reasonable officer, presented with the information furnished to the defendants prior to the arrests, would have viewed the defendants' conduct as unlawful.

## V. CONCLUSION

Based on the foregoing reasons, this Court must deny the Defendants' Motion for Summary Judgment.

## VI. REQUEST FOR ORAL ARGUMENT

The plaintiffs request oral argument on the within Opposition to Defendants' Motion for Summary Judgment as they believe oral argument will assist the court.

Respectfully submitted,
The Plaintiff,
By their Attorneys,

_____
Eric J. Parker, Esq. BBO#549513
Susan M. Bourque, Esq. BBO# 647195
Parker Scheer LLP
One Constitution Center
Boston, MA 02129
(617) 886-0500

Dated: 11-22-04