UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-CV-10834-RGS

ANTONIA DETOLEDO and
LIANA WILLIAMS

v.

COUNTY OF SUFFOLK, LT. ANGELO RAO,
SGT. JANET SINCLAIR, and DEPUTY SYLVIA THOMAS

MEMORANDUM AND ORDER ON INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

July 26, 2005

STEARNS, D.J.

Plaintiffs Antonia DeToledo and Liana Williams allege to have been unlawfully arrested, detained, and in Williams' case, subjected to an illegal strip search on July 26, 1998, during a visit to the South Bay House of Corrections (South Bay). Defendants Captain Angelo Rao,[1] Sergeant Janet Sinclair, and Deputy Sylvia Thomas are South Bay corrections officers employed by defendant Suffolk County. The Complaint was originally filed on June 13, 2001, in Suffolk Superior Court, where it resided for two years before being removed to the United States District Court. The Complaint seeks to establish personal liability on the part of the individual defendants for violation of the plaintiffs' civil rights and vicarious liability on the part of Suffolk County under G.L. c. 258 (the Massachusetts Tort Claims Act) for defendants' alleged negligence. The defendants deny

---

[1]In the Amended Complaint, Rao's rank is given as lieutenant, although it is apparent from the pleadings that his actual rank was that of Captain.

that any right secured by federal or state law was violated. The individual defendants move for summary judgment on all claims.[2]

BACKGROUND

In the light most favorable to plaintiffs, the facts are as follows. On Friday evening, July 24, 1998, Liana Williams sought to visit her fiancé, Michael Etheridge, then a detainee at South Bay. When Sergeant Elaine Ruplis, the visitors' supervisor, ran a routine computer check, she discovered that Williams was the subject of an outstanding warrant. Investigating further, Ruplis learned from Donald Lewis, a records officer, that the warrant had been recalled. Lewis printed out the recall notice and gave it to Ruplis. Ruplis, however, neglected to enter the correction into South Bay's computer system.[3]

On July 26, 1998, Williams returned to South Bay to visit Etheridge. When she arrived at the visitor's area, Antonia DeToledo was already present. The two women did not know one another. While processing Williams, Officer Robert Rowland came upon the warrant listing. He immediately notified Captain Rao, the shift commander. Rao asked Sergeant Sinclair to retrieve a copy of the warrant. While doing so, Sinclair discovered the recall notice that Lewis had given to Ruplis. Sinclair delivered the notice and a copy of the warrant to Rao.[4]

---

[2]No motion has been brought on behalf of Suffolk County.

[3]Ruplis refused permission for Williams to visit Etheridge that evening after Williams' stepson became unruly.

[4]The warrant had been issued on September 28, 1995, returnable on complaints alleging receipt of stolen property, larceny, forgery, and uttering. The latter two offenses are felonies under Massachusetts law. If the value of stolen property exceeds $250, receiving stolen property and larceny are also felonies. From the face of the warrant

2

Rao reviewed the paperwork and mistakenly determined that the warrant was active. In his deposition, Rao testified that he did not have his prescription glasses with him and was unable to read the warrant.[5] Rowland told Rao that Williams had asked for the key to the ladies' room and had left her driver's license as a deposit. Rowland gave the driver's license to Rao. Williams, however, had not gone to the ladies' room but had given the key to her stepson so that he could visit the men's room.[6]

Rao proceeded to the restroom area of the lobby. As a woman emerged from the ladies' room, Rao compared her likeness to the picture on Williams' driver's license. Rao testified that while the similarities were not obvious (the hairstyles were different), he thought that the picture might be dated. The woman was in fact DeToledo. Rowland testified that he knew that the wrong woman had been singled out "but opted not to say anything until the officers entered the Booking Area . . . to avoid a scene in front of the other visitors." DeToledo, whose native language is Portugese and who speaks only limited English, was confronted by Rao and other uniformed officers. DeToledo testified

---

Williams was charged with the felony crimes. The warrant had been recalled on January 13, 1997.

[5]Specifically, Rao testified that he "looked down and I could barely make out the letters on the social security number and the name. I could see the name. I could barely see the social security number. Later on when I was in my office writing my report, I looked down and I was looking for the docket number and I couldn't see it. I didn't have my glasses. They were in the shop. So I went down to my locker room and I took out a pair of Osco glasses and I came back in and I put them on. And I looked at it at that time and that's when I saw these lines now that say recalled warrant where originally they looked like a black line going across the paper."

[6]The key opened the door to both the mens' and the womens' restrooms. Jail rules permitted only one person to be in either bathroom at any given time.

that she was so shaken by the confrontation that she does not recall any conversation. Both Rao and Rowland testified that when DeToledo was asked if she was Liana Williams, she nodded affirmatively. The question was repeated and DeToledo answered "yes." When the officers informed her of the arrest warrant, DeToledo indicated that she did not understand what they were saying. She was handcuffed and escorted towards the booking area.[7] The procession came to halt a minute or two later when Rowland told Rao about the mistake in identity. Before the handcuffs could be removed, DeToledo began to have difficulty breathing. Medical personnel were summoned and an ambulance transported DeToledo to the Boston Medical Center.

Rao meanwhile located Williams in the lobby where she was standing with her six-month old baby and her stepson. Rao told Williams that she was being arrested on an outstanding warrant. Williams protested repeatedly that the warrant had been recalled and that documentary proof that the warrant was invalid could be found in her visitor's locker. Rao refused Williams' requests to retrieve the documents.

Williams asked the officers to summon a friend to take custody of her children. She also asked that they not handcuff her in the children's presence. The officers complied with both requests and handcuffed Williams only after she had passed through the metal detector leading to the sallyport. Once inside, Williams was taken to a "shake down" room where either Sinclair or Deputy Thomas conducted a strip and visual body cavity search.[8]

---

[7]Sinclair applied the handcuffs on Rao's orders.

[8]The record is unclear as to which officer performed the search. Thomas testified that Sinclair conducted the strip search while she stood outside the "shake down" room. Stephen Jacobs, the Deputy Sheriff who investigated the incident, quoted Thomas as

4

Before and during the strip search, Williams told Thomas and Sinclair that she had proof that the warrant had been recalled. Williams was forced to remove all of her clothing, bend over and separate her buttocks, and open her mouth for visual inspection.

After the search, Williams was confined for several hours in a holding cell. At approximately 9:00 p.m., she was shackled and transported to the Nashua Street Jail. Upon arrival at Nashua Street, the admitting officer, after examining the papers, told the transportation officers that the warrant was invalid. Williams was returned to South Bay at approximately 11:00 p.m. She eventually arranged for a friend to meet her and drive her home.

Almost three years later, Williams and DeToledo filed this joint lawsuit against Suffolk County and "John Doe" in the Suffolk Superior Court. After a period of discovery, plaintiffs amended the Complaint to add the individual defendants and claims under the federal Civil Rights Act, 42 U.S.C. § 1983. The defendants thereafter removed the case to the federal district court.

The Amended Complaint is framed in twenty counts. Plaintiffs eventually agreed to voluntarily dismiss defendant Owen Julius (Counts XIII through XVI). DeToledo also dismissed her civil rights claims against Sinclair and Thomas (Counts XVII and XIX). The remaining counts allege federal and state civil rights violations on the part of Rao (both plaintiffs, Counts V through VIII) and Sinclair and Thomas (Williams only, Counts X, XII, XVIII, and XX). DeToledo and Williams also assert claims under the Massachusetts Tort Claims Act against Suffolk County (Counts I through IV).

---

saying "that she did the strip search."

DISCUSSION

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c). The movant has the "'initial responsibility of informing the district court of the basis for its motion, and identifying those portions' of the record showing the absence of a genuine dispute of material fact." See Bates v. Mackay, 321 F. Supp. 2d 173, 178 (D. Mass. 2004), quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The Civil Rights Claims

DeToledo asserts against Rao a Fourteenth Amendment due process-deprivation of liberty claim (the brief detention that occurred when Rao mistook her for Williams) and a Fourth Amendment excessive force claim (the application of handcuffs).[9] Williams alleges identical claims against Rao, as well as an excessive force claim (the strip search) against Sinclair and Thomas.[10] Government officials may be held liable under § 1983 for a deprivation of life, liberty, or property without due process of law if their conduct amounts to a reckless or callous indifference to an individual's constitutional rights. Germany v. Vance, 868 F.2d 9, 21 (1st Cir. 1989). "We have emphasized time and again that '[t]he

---

[9] Plaintiffs recognize that a false arrest claim is not viable under §1983. See Reid v. New Hampshire, 56 F.3d 332, 336 n.8 (1st Cir. 1995).

[10] While the Amended Complaint is somewhat muddled, it is clear from the opposition filed to the motion for summary judgment that both women attribute responsibility for the handcuffing to Rao, while Williams seeks to hold Thomas and/or Sinclair liable for the strip search.

6

touchstone of due process is protection of the individual against arbitrary action of government,' . . . whether the fault lies in a denial of fundamental procedural fairness, . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective . . . ." County of Sacramento v. Lewis, 523 U.S. 833, 845-846 (1998). To be actionable under the Due Process Clause, misconduct by state actors must exceed a high threshold of allowance for human shortcomings in managing the intricate processes of government. "[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. . . . It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id., at 849. See also Davidson v. Cannon, 474 U.S. 344, 347-348 (1986) (a merely negligent deprivation of life, liberty, or property, "simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent.").

In Daniels v. Williams, 474 U.S. 327, 334 n.3 (1986), the Supreme Court acknowledged that "something less than intentional conduct, such as recklessness or 'gross negligence,' [could be] enough to trigger the protections of the Due Process Clause." Cf. Farmer v. Brennan, 511 U.S. 825, 836 n.4 (1994) ("Between the poles [of negligence and purpose or knowledge] lies 'gross negligence' too, but the term is a 'nebulous' one, in practice typically meaning little different from recklessness as generally understood in the civil law."). In the wake of Daniels, the "less than intentional" standard

7

came to be defined as one of "deliberate indifference," that is, a state of mind reflecting a conscious disregard or callous indifference to an individual's rights, sufficiently egregious to "shock the conscience." See Wood v. Ostrander, 879 F.2d 583, 588 (9th Cir. 1989) (officer's "deliberate indifference" and "callous disregard" for the physical safety of a woman whom he left stranded in a dangerous neighborhood); White v. Rochford, 592 F.2d 381, 383 (7th Cir. 1979) (officers' callous disregard for the safety of children who were left unattended on the shoulder of a busy freeway after their parents' arrest). See also Miga v. City of Holyoke, 398 Mass. 343, 351-352 (1986) (officers manifested "deliberate indifference" in leaving an intoxicated, semi-conscious, and suicidal detainee alone despite warnings from other prisoners about her erratic behavior).

That both DeToledo and Williams were undisputedly innocent detainees is not dispositive of the deprivation of liberty claim.

> Respondent's innocence of the charge contained in the warrant, while relevant to a tort claim of false imprisonment in most if not all jurisdictions, is largely irrelevant to his claim of deprivation of liberty without due process of law. The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted – indeed, for every suspect released.

Baker v. McCollan, 443 U.S. 137, 145 (1979). DeToledo's claim is the easier to address. At most, DeToledo was the victim of a negligent case of mistaken identity. Having been told by Rowland that Williams had asked for the bathroom key, Rao made the reasonable assumption that Williams was using the ladies' room. He attempted to verify Williams' identity by consulting, however ineptly, the picture on Williams' driver's license. He also elicited what he reasonably believed was a confirmation by DeToledo that she was in fact

8

Williams before placing her under arrest. Alerted to the mistake by Rowland, Rao immediately rescinded the arrest. That DeToledo suffered an apparent anxiety attack is unfortunate, but "[t]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty or property." Daniels, 474 U.S. at 328. Consequently, DeToledo's deprivation of liberty claim will be dismissed.[11]

Williams' deprivation of liberty claim presents a closer issue. An officer who reasonably believes that he has probable cause to make an arrest has no duty to investigate a suspect's claims of innocence. Baker, 443 U.S. at 146. See also Sanchez v. Sweden, 139 F.3d 464, 468, n.8 (5th Cir. 1998). To the contrary, the law discourages officers from taking it upon themselves to make such determinations. "[A] police officer's initial finding of probable cause justifies not only arrest, but a reasonable period of continued detention for the purpose of bringing the arrestee before a *magistrate*. . . . Generally, once the arrest has been properly effected, it is the magistrate and not the policeman who should decide whether probable cause has dissipated to such an extent following arrest that the suspect should be released." Thompson v. Olson, 798 F.2d 552, 556 (1st Cir. 1986). See Brady v. Dill, 187 F.3d 104, 114 (1st Cir. 1999) (an inverse rule would have "the potential of turning police stations into tribunals for making preliminary determinations of guilt or innocence.").

The First Circuit, however, has identified an exception to the general rule. In Torres Ramirez v. Bermudez Garcia, 898 F.2d 224 (1st Cir.1990), the general marshal of the

---

[11]DeToledo, on the other hand, may have a viable cause of action under the Massachusetts Tort Claims Act for any negligence on Rao's part that resulted in her detention. The proposition is not tested as Suffolk County has not challenged the claim.

9

Guayama Court ordered the execution of an aging warrant without first checking readily accessible court records that showed that the warrant had been vacated. The Court of Appeals, in reversing a grant of summary judgment, held that a trier of fact could find that the marshal had acted recklessly in failing to verify the validity of the warrant. Id., 898 F.2d at 227. In Pena-Borrero v. Estremeda, 365 F.3d 7 (1st Cir. 2004), the Court of Appeals reached the same conclusion with respect to officers who persisted in executing a warrant despite being offered conclusive documentary evidence by the arrestee that the warrant had been withdrawn.[12] Id. at 13. Rao's actions cannot be meaningfully distinguished from those of the officers in Pena-Borrero. It may be that he had no duty to retrieve the documents from Williams' locker, although there was no impediment to his doing so or to his assigning the task to another officer. But there was no need to consult the documents in the locker. Rao was holding proof that the warrant was invalid in his own hands. It may be that Rao's vision was impaired because his glasses were "in the shop," as he testified at his deposition. That, however, is all the more reason why his failure to ask another officer to verify the meaning of the black line scratched over the face of the warrant, particularly in light of Williams' repeated protestations, could be found by a trier of fact to have crossed the line separating excusable neglect from reckless obstinacy and deliberate indifference to a another's rights. Consequently, the motion to dismiss Williams'

---

[12]Although Pena-Borrero postdates the events underlying the Amended Complaint, the First Circuit in that case rejected a qualified immunity argument, finding that the pursuit of an arrest in the face of unambiguous evidence that a warrant was unenforceable was objectively unreasonable and a violation of a plaintiff's clearly established Fourth Amendment rights. Id. at 14. Cf. Duckett v. City of Cedar Park, Texas, 950 F.2d 272, 279 (5th Cir. 1992) (a suspect arrested pursuant to a warrant must be released if police determine beyond a reasonable doubt that their warrant is invalid).

10

deprivation of liberty claim will be denied.[13]

The purpose of the Massachusetts Civil Rights Act (MCRA) is to provide under state law a remedy "coextensive with 42 U.S.C. § 1983 except that the Federal statute requires State action whereas its State counterpart does not." Batchelder v. Allied Stores Corp., 393 Mass. 819, 822-823 (1985). The MCRA is remedial in nature. It creates no substantive rights. Mouradian v. General Electric Co., 23 Mass. App. Ct. 538, 543 (1987). Thus, in order "to seek redress through [the MCRA as under its Federal analog, 42 U.S.C.] § 1983 . . . a plaintiff must assert the violation of a federal [or State] *right*, not merely a violation of federal [or State] law." Perkins v. Commonwealth, 52 Mass. App. Ct. 175, 181 (2001), quoting Blessing v. Freestone, 520 U.S. 329, 340 (1997). Moreover, in deference to the Legislature's concern that the MCRA not be interpreted to create "a vast constitutional tort," the Act is "explicitly limited" to situations "where the derogation of secured rights occurs by threats, intimidation or coercion" involving a harm "directed toward a particular individual or class of persons." Bally v. Northeastern University, 403 Mass. 713, 718-719 (1989).

---

[13] Neither DeToledo nor Williams has a viable excessive force claim arising from the application of handcuffs. Handcuffing a detainee is a standard police practice. Absent evidence that the handcuffs were incorrectly applied, or were applied so as to cause physical injury, their use does not constitute excessive force. Neague v. Cynkar, 258 F.3d 504, 508 (6th Cir. 2001); Brumfield v. Jones, 849 F.2d 152, 156 (5th Cir. 1988) (plaintiff's complaint that handcuffing caused him "discomfort" was insufficient to sustain an excessive force claim); ("[I]n the context of placing an individual under arrest, use of handcuffs alone cannot amount to excessive force."); McDermott v. Town of Windham, 204 F. Supp. 2d 54, 67-68 (D. Me. 2002) (policy and custom of handcuffing all arrestees did not support a claim that a municipality condoned the use of excessive force). See also Muehler v. Mena, ___ U.S. ___, 125 S.Ct. 1465, 1470 (2005).

For purposes of the MCRA, "a 'threat' . . . involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. . . . 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct. . . . ['Coercion' involves] 'the application to another of such force, either physical or moral, as to constrain [a person] to do against his will something he would not otherwise have done.'" Planned Parenthood League of Massachusetts, Inc. v. Blake, 417 Mass. 467, 474 (1994). While the MCRA does not require proof of specific intent it operates "almost entirely within the realm of 'intentional' behavior." Breault v. Chairman of the Bd. of Fire Comm'rs of Springfield, 401 Mass. 26, 36 (1987). Thus, negligence by itself is insufficient to establish the element of "threat, intimidation or coercion" as by definition negligence "excludes intentional conduct." Deas v. Dempsey, 403 Mass. 468, 471 (1988).

Applying these principles, DeToledo's claim under the MCRA must be dismissed as the most that she can show is negligence on Rao's part. On the other hand, while I am not aware of a case under the MCRA specifically equating recklessness with intentional conduct, I infer from the Supreme Judicial Court's repeated admonitions that the Act is intended to provide relief coextensive with that offered by § 1983, that the state of mind – deliberate indifference – sufficient to establish liability under § 1983 would also serve to establish liability under the MCRA. Thus, the motion to dismiss Williams' MCRA claim, to the extent that it alleges a deprivation of liberty, will be denied.

Qualified Immunity

Sinclair and Thomas claim that they are entitled to a grant of qualified immunity for their actions in strip searching Williams. Qualified immunity attaches to discretionary

12

conduct of government officials that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "[T]he qualified immunity inquiry . . . allows . . . for the inevitable reality that '*law enforcement officials will in some cases reasonably but mistakenly conclude* that [their conduct] is [constitutional], and . . . that . . . those *officials* – like other officials who act in ways they reasonably believe to be lawful – *should not be held personally liable*.'" Hegarty v. Somerset County, 53 F.3d 1367, 1373 (1st Cir. 1995), quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992), quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991) (*per curiam*).

In deciding whether qualified immunity attaches, "a court must first determine whether the plaintiff has alleged a deprivation of an actual constitutional right at all." Conn v. Gabbert, 526 U.S. 286, 290 (1999). Stated more formally, the "threshold" question is this: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if a violation of a right is found does the court proceed to answer the two remaining questions: was the right clearly established when the plaintiff suffered the constitutional injury; and if so, "whether a reasonable prison official, situated similarly to the defendants, would have understood at the time that the policy in place . . . transgressed the

13

Constitution."[14]  Savard v. Rhode Island, 338 F.3d 23, 27 (1st Cir. 2003).

Courts share the consensus view that a strip and visual body cavity search is a severe and degrading intrusion into personal privacy and bodily integrity, and if conducted without some reasonable basis, violates the Fourth Amendment. Roberts v. Rhode Island, 239 F.3d 107, 110, 113 (1st Cir. 2001). Thus, the first step in the Saucier sequential analysis "need not detain us." Savard, 338 F.3d at 27. The second step requires a determination of whether the right of a person arrested for a nonviolent crime to be free of a suspicionless strip search incident to incarceration was clearly established on July 26, 1998. In Ford v. City of Boston, 154 F. Supp. 2d 131 (D. Mass. 2001), a case challenging the identical strip search policy at issue here, Judge Gertner concluded that the right to be free of such searches was established on June 25, 1997, when the Court of Appeals in Swain v. Spinney, 117 F.3d 1 (1st Cir. 1997), held that a strip search of an arrestee "ordinarily" requires a reasonable suspicion that the arrestee is concealing contraband, weapons, or evidence on her person. Savard, 338 F.3d at 29.

There is a longstanding tension in the law between the rights of pretrial detainees

---

[14]"The right in question, . . . cannot be simply a generalized right, like the right to due process. . . . It must be clearly established in a 'particularized' sense, so that 'the contours of the right' are clear enough for any reasonable official in the defendant's position to know that what the official is doing violates that right." Danese v. Asman, 875 F.2d 1239, 1242 (6th Cir. 1989). As a rule, a right is "clearly established" when it is enunciated by a court of controlling authority in the defendant's jurisdiction in a case sufficiently similar in its facts "that a reasonable officer could not have believed that his actions were lawful." Wilson v. Layne, 526 U.S. 603, 617 (1999). See also Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 144-145 (1st Cir. 2001) (relevant state, as well as federal decisions should be considered). While "general statements of the law are not inherently incapable of giving fair and clear warning," they do so only if their application to a specific set of facts is clear. United States v. Lanier, 520 U.S. 259, 271 (1997).

14

and the imperative demands of institutional security. In 1979, the Supreme Court made clear that the Constitution imposed no categorical bar to the strip searching of persons jailed while awaiting trial, nor did the law require probable cause for such searches, so long as the actions of prison officials were reasonable in scope, manner, and purpose. Bell v. Wolfish, 441 U.S. 520, 558-560 (1979). As the law developed after Wolfish, more stringent standards came to govern strip searches of pretrial detainees than those applicable to convicted inmates. Courts also drew distinctions among pretrial detainees depending upon the nature of the crime for which they were arrested and the type of institution in which they were held. In Arruda v. Fair, 710 F.2d 886, 887-888 (1st Cir. 1983) (Breyer, J.), the First Circuit gave wide berth to a prison policy subjecting inmates to indiscriminate strip searches. "We reasoned that because the searches involved the most dangerous of prisoners as they departed from, and entered into, a particularly sensitive area of a maximum security prison, security concerns provided a compelling justification for the . . . policy." Savard, 338 F.3d at 29 (discussing Arruda). On the other hand, courts generally rejected the application of blanket strip search policies to detainees arrested for petty crimes and non-violent misdemeanors, while condoning blanket strip searches of persons arrested for violent crimes and drug-related offenses. See Weber v. Dell, 804 F.2d 796, 801-803 (2d Cir. 1986) (finding unconstitutional a policy mandating the strip search of all traffic offenders and misdemeanor arrestees); Stewart v. Lubbock County, Texas, 767 F.2d, 153, 155-157 (5th Cir. 1985) (misdemeanors punishable only by fines); Chapman v. Nichols, 989 F.2d 393, 395 (10th Cir. 1993) (all arrestees). Compare Thompson v. City of Los Angeles, 885 F.2d 1439, 1447 (9th Cir. 1989) (upholding

15

mandatory strip searches of all persons arrested for crimes "associated with violence"); Masters v. Crouch, 872 F.2d 1248, 1255 (6th Cir. 1989) (same).

That Swain settled the strip search issue in this Circuit with respect to pretrial detainees, as Judge Gertner thought in Ford, is thrown into doubt by subsequent First Circuit cases. The arrestee in Swain was held in isolation in a temporary holding facility where there was no risk of contact with other prisoners. That fact, and the difference in magnitude between security concerns in a holding cell and those in a prison, led an equally divided *en banc* Court in Savard to conclude that neither Swain (nor Arruda) gave definitive guidance with respect to pretrial detainees.

> In the end, we recognize that both Swain and Arruda offer valuable insights, but that neither is a very exact match. While Swain makes clear that strip searches ought not lightly to be indulged, the factual context of the case presented rather minimal security concerns. And while Arruda makes clear that institutional security needs may require intrusive measures in a maximum security setting, that case dealt not with persons arrested for relatively innocuous misdemeanors, but, rather, with hardened criminals. So long as the facts in these cases are distinguishable in a fair way from the facts at hand – and we believe that they are – then neither of them can be said to have clearly established the law for purposes of a qualified immunity determination in the instant case.

Savard, 338 F.3d at 30. Savard left standing a district court grant of qualified immunity to defendants who had implemented a policy mandating strip and visual body cavity searches of all persons admitted to a facility housing pretrial detainees, convicts in protective custody, and newly sentenced felons.

I will assume without deciding that by July 26, 1998, the law was reasonably clear in banning strip searches in a case like this one (although Swain did not address the issue of the reasonableness of a policy mandating strip searches of persons like Williams who

16

are arrested for serious non-violent felonies).[15]  Thus, the remaining step in the Saucier analysis requires a determination of whether a reasonable corrections officer in the position of Thomas (or Sinclair) would have known that her actions in carrying out a strip search in accordance with institutional policy would violate Williams' Fourth Amendment rights.  At the time, the women officers were acting pursuant to a written directive promulgated by the general counsel of the Suffolk County Sheriff's Department on behalf of their ultimate superior, the Sheriff.  The policy had been in place in one form or another since at least 1991.  See Ford, 154 F. Supp. 2d at 135 n.6.  Neither woman held a policymaking position or was imbued with the discretionary authority to dispense with the strip search of a prisoner, even had the policy permitted the exercise of such discretion.  Under the circumstances, it would be unreasonable to conclude that a similarly situated line officer would have believed that compliance with a long-established policy directive emanating from the leadership of the Department involved a violation of a prisoner's constitutional rights. That the defendants are excused from liability by virtue of "following orders" is not intuitively appealing, but also not shocking in a correctional environment strongly influenced by military values of hierarchy and obedience to orders.  A ruling encouraging low-ranking officers to second-guess the constitutionality of policies and procedures mandated by their superiors would appear neither constitutionally wise nor institutionally desirable. Nor does elemental fairness counsel holding rank-and-file officers

---

[15]In Roberts, 239 F.3d at 113, the Court of Appeals found a blanket strip search policy unconstitutional insofar as it applied to minor offenses. The Court defined "minor offenses" as "*misdemeanors* involving minor offenses or traffic violations." Id. at 112 (emphasis added).

liable while letting those who formulated and implemented an unconstitutional policy go scot free.[16] Consequently, both Sinclair and Thomas are entitled to a grant of qualified immunity.[17]

ORDER

For the foregoing reasons, the motion for summary judgment as to DeToledo's claims against Rao as set out in Count V (MCRA) and Count VII (42 U.S.C. § 1983) of the Complaint is ALLOWED. The motion for summary judgment as to Williams' federal and state deprivation of liberty claims against Rao as set out in Count VIII and Count V of the Complaint is DENIED. The claims of DeToledo and Williams that the use of handcuffs constituted the use of excessive force are DISMISSED. The motion for summary judgment as to Williams' claims against Sinclair and Thomas is ALLOWED. The Clerk will assign a trial date on the remaining claims.

---

[16]A political entity that causes a constitutional injury by implementing a constitutionally unsound policy may be held liable for money damages under § 1983. Bd. of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 404 (1997). The same is true of a supervisor. Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581-582 (1st Cir. 1994). For reasons that are not explained, Williams has not named either Suffolk County or the Suffolk County Sheriff as defendants in her § 1983 claim. Rather she has named the County on a theory of *respondeat superior* under the Massachusetts Tort Claims Act, G.L. c. 258, § 1 *et al*. The County has not moved for summary judgment, although under the Tort Claims Act liability extends only to ordinary and gross negligence, McNamara v. Honeyman, 406 Mass. 43, 46 (1989), or in some cases to wanton and reckless conduct, Molinaro v. Northbridge, 419 Mass. 278, 279 (1995). The conduct of Sinclair and Thomas, on the other hand, is alleged to have been intentional. For such conduct, Suffolk County, as the public employer, is not liable. MacLean v. Delinsky, 407 Mass. 869, 878 n. 6 (1990).

[17]The grant of immunity also extends to the claims brought against Sinclair and Thomas under the MCRA as its immunity provisions are patterned after and consistent with federal § 1983 law. See Duarte v. Healy, 405 Mass. 43, 46-47 (1989); Rodriques v. Furtado, 410 Mass. 878, 881-882 (1991).

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE